## Burke *versus* Hammond.

1. When ejectment is sought to be maintained against an intruder by possession alone, it must be an actual possession, which must be evidenced by acts indicating permanency of occupation, such as residence and cultivation.

2. Where the possessor leaves the premises, his intention to return will not continue his possession unless there be some indication upon the property which will give notice of his intention, otherwise abandonment will be presumed.

3. Where one enters on a tract of land claiming the whole, his occupancy of part will make his possession co-extensive with his claim.

4. A continuous claim of land, payment of taxes for twenty-one years and the exercise of such acts of dominion as the character of the land warrants, will raise a presumption, as against an intruder, of a grant from the warantee.

5. Occasional invasions of the property, amounting to mere trespasses, and occasional payment of taxes, will not raise such presumption.

6. Testimony of a witness that he saw amongst the claimant's papers a deed for a tract to the claimant, without saying by whom it was executed or when, was inadmissible, the deed being lost, to show title in the claimant or raise the presumption of a grant.

May 15th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Error to the Court of Common Pleas of *Bedford county*: No. 28, to May Term 1874.

This was an action of ejectment, brought October 20th 1869, by Essington Hammond against Josiah C. Burke, for a tract of 160 acres of land in Union township. The defendant took defence for 145 acres and 10 perches of the tract claimed.

The case was tried December 13th 1872, before Rowe, J. The plaintiff gave in evidence, warrant dated June 1st 1763, to James Johnston, for 300 acres, called the Two Runs or Five Springs; survey September 8th 1797 for 749¾ acres. This survey covers the land in dispute.

After evidence of search for a deed for the Johnston warrant to Dr. Peter Shoenberger, under whom plaintiff claimed, and of inability to find it, plaintiff, under objection and exception, then read the deposition of Michael Reed, who testified: " I surveyed James Johnston last time in 1859; surveyed it in Dr. Shoenberger's lifetime; examined his papers; his land-book laid before me; among those papers there was a deed for the James Johnston tract and the Edward Evans tracts; I saw those deeds among the land-papers time and again; in McCormick's time I made a thorough examination of those papers; he also had a commissioner's deed for part; the deed I saw embraced 749 acres; the two deeds were recorded at Bedford; I think they were from Goldsboro; Dr. Shoenberger's deed for the Johnston was before the Goldsboro; before the Evans title; he had commissioner's deed for part of the Johnston; it was marked on the ground; I can't say who deed was

[Burke v. Hammond.]

from; I think it is on record; for 749 acres. It was from one of these Philadelphia men; I think deed is recorded; it was a regular drawn up deed; it said 'grant, bargain and sell;' he had a deed for Croyle Improvement, after it was vacated and sold at treasurer's sale; do not know from whom, but suppose the man who bought it at Croyle's sale. I saw that McCormick had these deeds in 1859; might have seen them about 1840;' first time saw deed and assignment to Dr. Shoenberger."          :

Also, under objection and exception, the deposition of Matthew Simpson, who testified: "At furnace fifteen years; Bice lives in it now; different men there for different years; Martin Dively there when I first came there; John Fetters next; Michael Reesey, then Bice; occupied ever since I came there; no coaling on Johnston since I came there; know lines; around three times; cleared land near to Burke's house; cleared before I came there. Think were written leases between Dively, Fetters, Reesey and Bice; I leased as manager; did not specify number of acres; mentioned farm cleared and land that was not cleared; part of land given as unseated; all given in as seated; tenants to pay taxes on the part known as that farm; run line across to pine; a marked line; tenants did not occupy part over next line; we claimed all the land; have heard of the 'Croyle Improvement;' we farmed these fields on the disputed part in 1858 and 1859; farmed in wheat; Mr. Gochenour put it out under Bice, and Bice leased it from me; no actual residence on this part of land after Croyle till Burke entered; searched; could not find deeds; were in hands of Pollard McCormick; then of Coys; P. McCormick is dead; Johnston tract is part of Sarah Furnace lands; I never saw deed for Johnston tract; Mr. Reed had access to papers at house that I had not; he was making a chart or draft of the lands; I saw the Land Book; it is lost; tax paid."

Plaintiff gave in evidence, patent to Dr. Shoenberger for 453¼ acres, surveyed on warrant to Edward Evans; this land being within the lines of the Johnston survey.

Dr. Shoenberger's title, if any, to the land in dispute passed by his will to D. C. McCormick and other McCormicks, and from them by subsequent conveyances to the plaintiff.

D. Gochenour testified: "I first knew the land on which defendant lives in 1819; no one lived on it then; Croyle lived a mile away on another tract where Boyer now lives; when I first came there a small field was cleared on the disputed tract where Burke lives; Croyle, after he helped to move his crop off of that piece, got hurt and died in that year, 1819; it was then called the Widow Croyle Improvement; she had it farmed for several years by others, and then I farmed it for her for three years, in 1827–8–9; I don't know whether it was farmed after that; Shoenberger got possession of it in 1832, and began to chop in the fall;

chopped in '33 also, and then coaled in the summer; the first job that was coaled for Sarah Furnace, on the ridge part, was coaled on this land; Shoenberger had the timber taken off from year to year, until it was all gone; it laid open, commons, while they were hauling coal for it, until 1858. In 1858 Samuel Bice got permission from Sarah Furnace to clear it off and fence it up; then, for two years, 1859–60, I farmed it for him; that was the end of our work there; no one ever lived on that part now in dispute before that; in 1820 or 1821 I know that Frederick Stambaugh was living on the Evans tract; he lived there a good while; ten or twelve years any how; Martin Dively was there next; he lived there a small lifetime; from the time of his marriage until his children were grown up; John Feathers came in next, who was there one or two years; next was Michael Reesey, who remained from four to five years; after Reesey, David Dickey, who lived there two years; the house was burnt, and no one lived there for one year; then Samuel Bice, who is there now; has been there seven or eight years."

(All these tenants on the Edward Evans tract, it is admitted, were under Dr. Shoenberger or his predecessor in title.)

"Defendant's house is four or five rods away from the widow Croyle field, the same field I worked in 1858 and 1859; Bice added about one acre in making fence; I know the Edward Evans tract; it lies on the west side of the disputed land; I know the Christly Bouser tract; it adjoins the land in dispute on the north side; the Bouser tract separated the John Croyle residence and improvement from the little field; they were about a mile apart; I know the Johnston tract and where defendant now is; from 1819 to 1861 there never was any residence or house on the land in dispute, unless you call colliers' cabins, houses; from 1819 to 1861 there was no cleared land on this tract in dispute, except the little field there in 1819; then grain was growing on it, put in by Croyle; from 1829 to 1858 the field was not cultivated, but a perfect commons; fence gone; in fall 1833 Dr. Shoenberger commenced coaling it; no possession except the colliers; no cultivation until 1858; no building on the Johnston tract, except what was on the Evans part of it; Dr. Shoenberger coaled the Johnston tract until it was all cut off; the land was heavily timbered; the first job was cut on the land in dispute; the second year they cut the Bouser tract and part of this."

Isaac Pressel testified: "I have known the Johnston since I was ten or twelve years old; my father lived on the adjoining tract; the Johnston was called in early times the Big Survey, Dr. Smith's land and Pine Ridge; all that land was known as Pine Ridge; Croyle claimed two or three acres, and was called Croyle's Improvement, where defendant now is; Croyle did not live there; after Shoenberger got it and commenced chopping and coaling, we

[Burke v. Hammond.]

called it the Furnace land; Dr. S. cut the timber off the part where defendant now is; two or three years after the furnace was built, in 1832; he continued cutting until he had cut the whole pine ridge off."

Jacob Kissinger testified: "I have known the land where defendant lives forty years; Dr. Shoenberger had it in possession; it was coaled by Shoenberger; the land belonged to Sarah Furnace; it was called the Johnston tract, Pine Ridge; I know defendant's improvement; it was coaled about forty years ago; the second year of the furnace."

Michael Walter testified: "I have known this disputed land tract since 1836; I cut timber upon it for Dr. Shoenberger about that time for coaling; the cutting was done for Sarah Furnace; I think the Burke Improvement was made in 1861; I helped to survey the James Johnston three years ago; the Burke Improvement is inside those lines; the defendant's house is close to the line of the Johnston and Christly Bouser; I only cut on that land in the winter of 1836; January, February or March 1836; I helped to cut on this land in dispute; towards the Evans; the Bouser tract lay north of the tract I cut on; Shoup abandoned the Burke Improvement once; when he went to the army; Burke is there now; has been there about eight years or more; he lives there and cultivates the land."

Samuel Bice testified: "I live on the tract called Johnston and Evans; I have been there about eight years; I first rented from the McCormicks, then from Mr. Hammond; before me, David Dickey lived there; I have known the land in dispute for thirty years; I rented a field, and fenced it for two crops, from David McCormick, in 1858 and 1859; in 1860 we cut and hauled the last of the crops away; I left the field fenced; the balance of the tract had been cut and coaled before I knew; I made rails on the Burke Improvement for David McCormick some four or six years before 1858; they were hauled to Sarah Furnace; the land was known as Shoenberger land, attached to Sarah Furnace; I live within the lines of the Evans; this land was cut and coaled in 1839; all cut off when I came there; most of the rails were made on the Bouser, over the line between the Bouser and Johnston; near the line; some on both sides; they claimed all the land; the Bouser tract also; in 1858 no fence, when I went there to this land in dispute; no appearance of a fence; nothing in the field; the field four or five acres; Gochenour did the work for me; the field was empty; no farming done from the time I took my last crop in 1860, until Shoup went there; I never saw Shoup there."

There was other evidence of the same character. Also; that by survey in 1869, it was ascertained that west line of defendant's improvement corresponded with the Evans line east.

There was evidence also to show payment of taxes by Dr.

[Burke *v.* Hammond.]

Shoenberger and his successors including the plaintiff, in different years from 1835 to 1859.

The defendant gave evidence that Dr. Shoenberger had rented the Evans tract and Shoenberger coaled the remainder of what was within the lines of the Johnston survey; that "every one hauled logs from the Pine Ridge;" that Shoup went there in April or May 1861, to make an improvement; "the Bice field" was empty, Shoup put a cabin there through the summer and cultivated the field; he.went to the war in 1872, when he came back the defendant bought from him and had lived there ever since and cultivated it.

There was evidence that Dr. Shoenberger and his successors had disclaimed title to the land in dispute.

The defendant's points were:—

1. There is no such evidence of title in plaintiff to the land in dispute as will enable him to recover, and the verdict must be for the defendant.

2. There never was such title to any part of the land in dispute in John Croyle, nor has the plaintiff so connected his possession or that of his predecessors therewith as to avail him in this action.

3. Plaintiff and his predecessors do not stand in the position of "earlier intruders" upon the Johnston tract so as to give them a title superior to defendant to that survey; but as trespassers thereon, and defendant may successfully defend upon said survey as an outstanding title.

4. If the jury believe that Dr. Peter Shoenberger was not in possession from 1834 until the time of his death he had acquired no such title by adverse possession as would enable his devisees to recover and had at the time of his death no title to devise.

5. The McCormicks acquired no title to the land in dispute by leasing the small field in 1858 and 1859.

6. If the jury believe from the evidence of David Dickey and Matthew Morehead that Peter Shoenberger had no title to the land in dispute, but only claimed the same and took possession thereof, to secure the timber growing thereon and then abandoning the land, then plaintiff had no title and the verdict must be for the defendant.

The court charged:—

["I think that the decision of two questions by the jury will make an end of this controversy.

"The first question is: Were the McCormicks whose title the plaintiff has, in the actual possession of the tract of land in dispute at the time of the entry of Shoup upon this tract for the purpose of appropriating it to himself, whose right the defendant Burke acquired? Now the principal facts, material to the solution of this question, as I understand the evidence, are as follows:—The tract in dispute is part of the James Johnston survey, which is

[Burke v. Hammond.]

itself a part of a stretch of mountain side called the Pine Ridge.   On the Johnston tract, as far back as 1819, a small field of three or four acres was cultivated, which is within the limits of the tract in dispute.   From about 1830 to 1858, this field was not cultivated, nor was it enclosed before 1858.   It lay an open commons. In 1832 and 1833, Dr. Peter Schoenberger, whose title plaintiff has, cut off all the timber growing on the Johnston tract and the Pine Ridge, for Sarah Furnace.   There was no building on the land in dispute or on the Johnston's, outside the lines of the Evans tract, at any time.   In 1858, one Samuel Bice got permission from the owner of Sarah Furnace to clear off the small field and to fence it up.   In 1858 and 1859, it was farmed by Bice, then in possession under the McCormicks, and in 1860 he cut and hauled away the crop.   'I left the field fenced,' says Bice.   Then, in 1861, Shoup entered upon the land in dispute, which includes the field, and put up a cabin.   The war called him away for a year or two.   When he returned, he made some arrangements with Burke, the defendant, who entered upon the tract and held it as his own.   The evidence seems to me to show also, and it can hardly be doubted, that the owners of Sarah Furnace, the predecessors in title of plaintiff, were claiming and treating the Johnston tract as part of the Sarah Furnace lands, from the time of the erection of the furnace until the entry of Shoup.

" If these facts are established by the evidence, and it seems to me they are, we have at the time of the entry of Shoup this state of things, namely : The cultivation of an enclosed field on the Johnston, by persons in under lease or license from the McCormicks, who were claiming the whole of the Johnston tract, which included the land in dispute.   This would amount to actual possession by the McCormicks of the land in dispute.   It will not do to say they were not in the actual possession of the enclosed field in 1861, merely because they did not farm the field in 1860 or 1861, but had only cut and carried away the crop in 1860.   An owner of an enclosed field must surely be permitted to allow it to lie idle a year or two years, without rendering it liable to be appropriated by any one coming along.

" If you should be of opinion that the McCormicks whose title the plaintiff has, were in the actual possession of the land in dispute when Shoup entered, such possession merely, without showing legal title, is sufficient to enable plaintiff to recover against the defendant, a mere intruder showing no title.   But if you should hold otherwise, then plaintiff cannot recover, unless it be upon this other ground that the title under the warrant to James Johnston became vested in him or his predecessors in title.]   *   *   *

The court then gave a synopsis of the evidence and said :—

[" I think there is in all this enough to raise a presumption of a conveyance of the right under the James Johnston warrant and

26 P. F. Smith—12

[Burke *v.* Hammond.]

survey to Shoenberger or the McCormicks, by deed which has been lost.] But if you are of a different opinion upon this question and also think there was no actual possession of the land in dispute by the McCormicks in 1861, when Shoup entered, your verdict will be for the defendant.

" It is not necessary to read and answer the points presented by counsel. So far as they are not substantially affirmed in what we have said, of course, they are refused."

The verdict was for the plaintiff.

The defendant removed the record to the Supreme Court by writ of error, and there assigned the following errors, amongst others :—

1. Admitting the deposition of Michael Reed.

5, 7. The parts of the charge in brackets.

8-13. Refusing to affirm the defendant's points.

*J. B. Cessna* and *J. Cessna,* for plaintiff in error.—There must be continuous acts of ownership by a claimant for at least twenty-one years to supply the place of a lost deed; there can be no presumption short of that period : Warner *v.* Henby, 12 Wright 187 ; Fox *v.* Thompson, 7 Casey 172. Acts of ownership by Dr. Shoenberger cannot be connected with such acts by others without showing something to raise a presumption that he owned the title of the first claimant : Schrack *v.* Zubler, 10 Casey 38. If Shoenberger *had* the legal title to the Johnston warrant, purchasing the Evans warrant and perfecting it by patent, prove an abandonment of the Johnston outside of the Evans warrant : Sabins *v.* McGhee, 12 Casey 453 ; Adams *v.* Jackson, 4 W. & S. 78. Actual possession may be by residence and cultivation : Susquehanna, &c., Railroad Co. *v.* Quick, 18 P. F. Smith 189 ; Huffman *v.* McCrea, 6 Id. 99. There cannot be an adverse constructive possession ; adverse possession is aggressive : Stephens *v.* Leach, 7 Harris 262.

*G. H. Spang* and *S. L. Russell,* for defendant in error.—There was evidence sufficient to raise a presumption of a conveyance to Shoenberger of the right under the Johnston warrant : Galloway *v.* Ogle, 2 Binn. 468 ; and an intruder entering on warranted land is entitled to no favor : Taylor *v.* Dougherty, 1 W. & S. 324 ; Hastings *v.* Wagner, 7 Id. 215 ; Fox *v.* Thompson, 7 Casey 172.

Mr. Justice GORDON delivered the opinion of the court, October 12th 1874.

The testimony in this case does not raise the question of title under the Statute of Limitations. The evidence does not show that either of the parties maintained such an actual and continuous possession of the land in dispute as would bar the right of the warrantee. The case therefore turns upon two distinct propositions : First, were the plaintiff's vendors in the actual possession of

[Burke *v.* Hammond.]

the land in controversy, either by themselves or their tenants, when the defendant settled upon it ?   In determining this question the occupation of the land by John Croyle, from 1819 to 1829, is not to be considered, forasmuch as that occupation was abandoned at the latter date, neither does it in any way appear to be connected with the plaintiff's title.   In like manner must we exclude the coaling operations of Dr. Shoenberger, for they lack both the permanency and continuity of that kind of possession which, for the time being, is equivalent to title.

The matter then narrows itself down to the inquiry whether, at the time the defendant entered upon the disputed premises, he intruded upon the actual possession of those under whom the plaintiff claims.   It will be observed, in the determination of this proposition, that we are to regard the fact of possession alone, and this must be evidenced by acts indicating permanency of occupation, such as residence or cultivation.   Where the possessor leaves the premises, his intention to return, of itself, will not avail to continue his possession ; there must, in order to produce this effect, be some indication left in or upon the property which will give notice of such intent; otherwise abandonment will be presumed.

What those indications are which signify an intent to continue the occupancy will readily suggest themselves even to a casual observer.   Buildings kept in a good state of repair, though not occupied, and fields properly fenced, so as to exclude marauding cattle, though not under immediate cultivation—these, and many other things of a like character, notify us unmistakably that the possession has not been abandoned.

We have thus been particular in stating the governing principles of cases like the present, in order that the court may have as clear a view as possible of our ideas, and thus avoid a resubmission to the jury of such facts as the Croyle improvement, the timber-cutting by Dr. Shoenberger, and the claiming of the Johnston tract as part of the Furnace property, as indications of actual possession.   The two latter facts would be pertinent in connection with the Bice improvement, to show the extent of the plaintiff's claim, but for no other purpose.   This evidence is admissible under the rule, that where one enters upon a tract of land, claiming the whole, though he occupies only a part of it, nevertheless his possession will be treated as co-extensive with his claim.

The second proposition presents the following question : Taking the whole of the evidence together, was there such a long-continued assertion of title, by user of the products of the land in dispute, payment of the taxes, &c., as would raise a presumption of a grant from the warrantee to those under whom the plaintiff claims ? The cases cited by the learned judge who tried this case are in point: Taylor *v.* Dougherty, 1 W. & S. 324 ; Hastings *v.* Wagner, 7 Id. 216 ; Fox *v.* Thompson, 7 Casey 174.   A continuous claim

[Burke *v.* Hammond.]

and payment of taxes for twenty-one years, have been held to raise such a presumption as against an intruder. "The rational ground for presumption," says Chief Justice Tilghman, in the case of Kingston *v.* Lesley, 10 S. & R. 383, "is when the conduct of the party out of possession cannot be accounted for without supposing that he has conveyed to the one in possession."

So in Warner *v.* Henby, 12 Wright 187, it is said by Chief Justice Thompson: "These presumptions, when ripened by time and the silence of the warrantee, supply the place of a conveyance where there have been continuous acts of ownership on part of the claimant. That period is not less than twenty-one years." And again, on the same page: "In other words, no presumption runs in his favor more than that of anybody else, if he does not entitle himself to claim it by sufficient acts for a sufficient length of time." From these authorities we learn that this presumption of grant arises only in favor of him who persistently and continuously claims the land for a long period of time, exercising over it from time to time such acts of dominion as the character thereof warrants and paying the taxes thereupon assessed. Occasional invasions of the property, which may amount to mere trespasses, will not suffice to raise this presumption, neither will the occasional payment of taxes. Whether the plaintiff and his predecessors in title brought themselves within this rule, was a question properly submitted to the jury. The court, however, committed an error in admitting the evidence of Michael Reed, to prove that at one time he saw among the papers of Dr. Shoenberger a deed to him for the James Johnston tract. The defect in this testimony is that it does not inform us when or by whom it was executed, or indeed whether or not it was ever executed by any one. This was clearly not evidence, as it neither showed title nor served to raise a presumption of grant. The proof amounted only to evidence of an unexecuted paper that could avail for no legitimate purpose whatever, and should therefore have been excluded. We discover nothing else that needs correction, but for the errors indicated the judgment is reversed, and a *venire facias de novo* awarded.