## WILMORE COAL CO. v. BROWN et al.

### (Circuit Court, W. D. Pennsylvania. September 29, 1906.)

### No. 26.

1. MINES AND MINERALS—CONVEYANCE OF MINERAL RIGHTS—CONSTRUCTION.

An instrument granting all the coal and minerals in or under certain land, with the right to mine and remove the same, under the law of Pennsylvania operates as a conveyance of title to the coal and minerals in place, whether or not payment therefor is to be made in a lump sum or by a periodical accounting and payment of a royalty, and notwithstanding a term may be fixed within which the coal or mineral is to be taken out; and a condition in such an instrument that a railroad shall be built into the region within five years, otherwise the grant shall be null and void, does not make it an option nor prevent the title from vesting in the grantee, as a condition precedent, but is a condition subsequent.

2. SAME—CONDITION SUBSEQUENT—FORFEITURE FOR DEFAULT.

A condition subsequent in a conveyance of the mineral under certain land, such as a provision that it shall be null and void unless a railroad shall be built in a designated place within five years, inures only to the benefit of the grantor and his privies in blood, and, being a mere right of action to enforce a forfeiture for breach of the covenant, does not pass to a subsequent grantee of the covenantee; but a re-entry by the grantor after default, or any equally significant act asserting title and dominion over the thing granted, such as the execution and recording of a second deed conveying the same mineral to another, who takes possession and mines thereunder, operates to devest the title of the first grantee and to revest it in the grantor for the benefit of the second. Nor is such devestiture prevented by the fact that at the time of making the second deed, which purports to convey title in fee simple, the grantor by a separate instrument assigns to the grantee all his rights under the first conveyance, although it will be prevented if the second conveyance is expressly made subject to the first, and therefore conveys only the grantor's rights thereunder.

3. SAME—FULFILLMENT OF CONDITION.

A condition in conveyances of coal under certain lands, with the right to mine the same, that they shall be void "if the railroad be not commenced within five years from this date," will not be construed to require the road to be built on any particular line nor by the grantee, but is satisfied if a road is built into the territory by any one near enough to the lands to afford reasonable facility for the shipment of coal to market.

4. DEEDS—CONDITION SUBSEQUENT—CONSTRUCTION.

Conditions subsequent in conveyances are not favored, and an unexpressed term will not be imported into such a condition on which to claim a breach.

[Ed. Note.—For cases in point, see vol. 16, Cent. Dig. Deeds, § 488.]

5. MINES AND MINERALS—COAL LEASE—IMPLIED COVENANT TO MINE WITH DILIGENCE—FORFEITURE.

A conveyance of coal with the right to mine, providing that the grantee shall render an account periodically and pay royalty on the amount mined, carries with it an implied covenant by the grantee to mine with reasonable diligence, even though no minimum quantity be fixed. But the remedy for a breach is not a bill to forfeit or avoid, but an action at law for damages, or possibly an ejectment, based on the right of re-entry for nonperformance; the grantee having an estate in the coal, which cannot be defeated or divested because of covenants broken, it not being so provided in the deed.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Covenants, § 170.]

6. SAME—ABANDONMENT.

A grant of mineral and mining rights, even though it vests the grantee with a legal estate, may be lost by abandonment; what facts are sufficient to work such forfeiture depending to some extent upon the character of the mineral or thing affected.

7. SAME.

Defendant obtained a large number of contracts, denominated "leases," from owners of land, conveying to him the coal and other mineral in and under such land, with the right to mine the same for 99 years, and of renewal in perpetuity. By the terms of the contracts he was to render an account to the lessors every three months and pay royalty at specified rates. *Held*, that his failure for 24 years after the execution of such contracts to take any steps whatever toward the mining or development of any of lands, or to pay any royalties, during which time coal was extensively mined by others in the vicinity and on some of the lands covered by such leases, operated as an abandonment and relinquishment of his rights thereunder, without regard to his actual intent, and notwithstanding his payment of taxes for some years and attempts to sell his rights; the time in which adverse possession of lands would give title under the state statute being 21 years.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Mines and Minerals, § 189.]

8. QUIETING TITLE—REMOVAL OF CLOUD—JURISDICTION.

A bill in equity may be maintained in a federal court by a complainant in possession for the cancellation of a number of coal leases held by defendant and affecting different tracts of land as clouds upon the title, where the material facts are not in dispute, there being no adequate legal remedy; and the court is not deprived of jurisdiction by the pendency of actions at law brought by the defendant in another jurisdiction, on some, but not all, of the leases, against another party, and to which actions the complainant is not a party.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Quieting Title, § 5.]

In Equity. On final hearing.

W. H. Ruppel and D. L. Krebs, for plaintiff.

H. Snowden Marshall and E. T. McNeelis, for defendants.

ARCHBALD, District Judge.[1] This is a bill to remove an alleged cloud on the plaintiff's title. In the years 1878 and 1880, the defendant J. Willcox Brown, a resident of Baltimore, Md., secured a large number of mining leases, aggregating about 16,000 acres, in different tracts, of various sizes, in Somerset county, Pa., as well as a like number in the adjoining counties of Indiana and Cambria, nineteen of which, of the Somerset lot, covering some 2,400 acres, are involved in the present suit. These leases were indentures under seal, and severally undertook, for the consideration, in some cases of $5 and in some cases of $10, to grant, bargain, and to sell to the said J. Willcox Brown, his heirs, executors, administrators, and assigns, "all the iron ore, coal, cement, and fire clay, and all other minerals of every kind," under the different tracts described, "including the privilege of boring any number of wells and taking therefrom, by such means as are or may be most practicable, petroleum, carbon, or coal oil, also any salt water that may be found on the premises and manufacturing the same into salt," together with the full and exclusive right, liberty, and privilege of min-

[1] Specially assigned.

ing, taking, and carrying away the said iron ore and other minerals, and of using such stones, earth, and water as might be necessary or required for conducting the mining operations. A few acres were reserved around buildings, and enough coal for the grantor's own use, and in some cases such as he might sell to his neighbors. The leases were to run for 99 years; the grantors covenanting at the end of that time to execute other leases of like tenor, for a similar term, renewable forever. In consideration whereof it was ageed by the grantee that on the expiration of every three months, whenever any ore or other minerals were mined, quarried, or otherwise reduced to possession and removed from the premises, he would render to the grantor, his heirs, executors, and assigns, a true and correct account thereof, paying for every ton of iron ore' ten cents; for every ton of coal, cement, fire clay, or other minerals than iron, five cents; and for every hundred barrels of petroleum or coal oil, and every one hundred bushels of salt, five per cent. of the net profits. The leases were duly acknowledged and put on record in the office for the recording of deeds in Somerset county, Pa., in July, 1880. A copy of one, as a type of all, although they differ in some minor particulars, is reproduced in the margin.[2]

The section where these leases were located was entirely undeveloped at that time, except for farming, and was discredited as coal or mineral territory by the State Geological Survey. There was no railroad into it, and in view of this it was provided, in somewhat varying terms, in all but four of the leases here in controversy, that unless one was

[2]This indenture, made this 3d day of January, one thousand eight hundred and seventy-nine, by and between Abraham Weaver, of the county of Somerset and state of Pennsylvania. of the first part, and J. Willcox Brown, of the city of Baltimore and state of Maryland, of the second and other part, witnesseth: That said party of the first part, in consideration of the sum of five dollars, to them in hand paid by the said party of the second part (the receipt whereof is hereby acknowledged), have granted, bargained, sold, aliened, enfeoffed, released, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, release, and confirm, unto the said party of the second part, his heirs, executors, administrators, and assigns, all the iron ore, coal, cement, and fire clay. and all other minerals of every kind, including stone or earth, as may be required for mining operations in, upon, and under all that certain tract of land situated in Paint township, county of Somerset. and state aforesaid, and containing one hundred and seventeen acres, more or less, and described as follows: Adjoining land with T. Hays, D. Shaffer, J. Nerenberger, and others (all minerals are to be drifted), with the appurtenances thereto appertaining, together with the full and exclusive right, liberty, and privilege of mining, taking, and carrying away said iron ore and other materials, as heretofore more fully recited, with such control of, rights in, and privilege of using said land and water as may be necessary in conducting mining operations in a full and convenient manner. To have and to hold all the said iron ore and other materials, as is more fully recited heretofore, and all the rights and easements aforesaid, in, upon, through, and under the said tract of land, and the hereditaments and premises hereby granted or mentioned, and intended so to be, unto the said party of the second part, his heirs, executors, administrators, and assigns, to and for his and their only proper use and behoof, for the period of ninety-nine years from the date hereof. The said party of the first part further covenants, for his heirs. executors, administrators, and assigns, that he will, upon the proper demand of the party of the second part, his heirs, executors, administrators, and assigns, and at the expiration of the term herein provided for, and upon tender by the said party of the second part, his heirs,

built within five years they should be null and void. As to those where no such provision appears, it is charged in the bill that there was a verbal undertaking to the same effect by the defendant's agent at the time of securing them. But this is denied in the answer, and the evidence to sustain it is unsatisfactory; and they must therefore be taken as they stand. A railroad being a recognized necessity, however, the defendant Brown, in addition to his leases, busied himself with getting rights of way, some 64 of which he secured; 7 of these being from parties whose leases are involved in this suit. The railroad which he had in contemplation was to start at Johnstown, Pa., on the main line of the Pennsylvania Railroad, and run up Stony creek, and Paint or Shade creek, to the old Rockingham furnace at the head of the latter, and thence southeasterly, by other waters, in the direction of Hagerstown, Md.; and it was in general conformity with this that the rights of way were taken. No such railroad, however, was ever built. But in 1880 the Baltimore & Ohio Railroad constructed a branch from their line at Rockwood, Pa., northerly about 40 miles, through the center of Somerset county to Johnstown, which followed down Stony creek a part of the way, by the mouth of Shade and Paint; and when it was being laid out the defendant Brown put his rights of way at the service of the Baltimore & Ohio engineers, although none of them were made use of.

The building of this road, however, did not lead to the mineral development of that section, which came about a number of years later in quite another way. In 1892 to 1894, Robert H. Sayre and others

executors, administrators, and assigns, of —— dollars, execute another lease, with the same covenants and terms as herein contained for a term of ninety nine years, renewable forever. If the railroad be not commenced within five years from this date, then this contract to be null and void.

In further consideration whereof, the said party of the second part, his heirs, executors, administrators, and assigns, promises and agrees with the said party of the first part, his executors, administrators, and assigns, that he will, at the expiration of every three months, whenever any ore or other materials, as hereinbefore more particularly recited, is mined, quarried, or otherwise reduced to possession by the said party of the second part, his heirs. executors, administrators, and assigns, and removed from the premises, render to the said party of the first part, his heirs, executors, administrators, and assigns. a true and correct account of the materials removed and taken from the premises during the said preceding three months, and pay it to the said party of the first part, his heirs, executors, administrators, and assigns, as follows; that is to say: For every ton of iron ore, of 2,240 pounds, ten cents. For every ton of coal, of 2,240 pounds, five cents. For every ton of cement or fire clay, of 2,240 pounds, five cents. For every ton of mineral ores, other than the above, of 2,240 pounds, five cents.

In witness whereof, the parties hereto have set their hands and seals this 3d day of January, in the year one thousand eight hundred and seventy-nine.

Abraham Weaver.    [Seal.]
J. Willcox Brown.    [Seal.]

State of Pennsylvania, Somerset County—ss.:

Before me, a justice of the peace in and for the said county and state, personally came Abraham Weaver, the grantor, and acknowledged the foregoing instrument of writing to be his act and deed, and desired the same to be recorded as such, according to law.

Witness my hand and seal the 3d day of January, A. D. 1879.

Stephen H. Griffith, Justice of the Peace.    [Seal.]

began taking up coal lands in this territory, getting together about 18,000 acres, including much of that which is now in controversy, which they subsequently conveyed to the Wilmore Coal Company, which they had organized; and a year or two afterwards they sold out their interests in the company to Mr. Edward J. Berwind, president of the Berwind-White Coal Mining Company, who thereby secured their holdings, which he increased later to some 35,000 or 40,000 acres. Both Mr. Sayre and his associates, and Mr. Berwind after him, bought outright, at so much an acre, the coal which they purchased; that already leased to the defendant Brown being conveyed to them in fee by the original lessors or those who had succeeded to the title, in most instances without regard to the leases, but in some cases subject to them, the rights of the lessors being assigned, and in all with actual knowledge of them. Having got together this extended acreage, Mr. Berwind endeavored to induce the Pennsylvania Railroad to run in a branch, but they declined to do so; and he was compelled to undertake it individually, which he did at an expense of about $500,000. This and the development of the different properties for mining, which followed, involving about $1,000,000 more, extended over two or three years, and not until some time in 1897, therefore, was any mining done; but since that time it has been actively pursued, and an extensive business built up, the operations being conducted by the Berwind-White Coal Mining Company, under the Wilmore Coal Company, to whom a royalty of 10 cents a ton is paid.

In securing the leases in suit and others in that region, Mr. Brown did not expect to do any mining personally, and he has not, either by himself or others, nor has he paid royalties, at any time, on any of them; his purpose being to sell the leases to others or to transfer them to some company in which he had an interest, which would operate them. He sold some of his holdings in the southern part of the county in this way, and he made several attempts to interest parties in the others, including the New York Central Railroad people, the Erie people, and the Baltimore & Ohio. Learning of Mr. Berwind's purchases, he finally offered them to him, but without success; these negotiations ending in the spring of 1895, after which no others were undertaken. In 1892 certain of the leases were assessed and sold for taxes, but were redeemed by Mr. Brown, who paid some $1,500 to do so. They were sold again in 1896, but this he resisted, and succeeded in having the sale set aside by the court. Learning in 1902 that the Berwind-White Company were mining on certain of the lands which he had leased, he sent an engineer to investigate the matter, receiving from him a detailed and extended report which confirmed the information, upon which he took counsel with the idea of legal action. Some delay was experienced, however, with regard to this; the one-quarter interest, which he had assigned to the agent who secured the leases, being outstanding in the hands of various parties. But, these having been got into line, a corporation was organized—the New Amsterdam Coal Company, defendant—to which all interests were transferred in exchange for stock; and in 1904 actions were brought by that company against the Berwind-White Coal Mining Company in the United States Circuit Court

for the Southern District of New York for damages for taking the coal from six of the different tracts in controversy, following which, in May, 1904, the present bill was filed. These are the general facts. Others will be referred to as we proceed. The question is whether, under the showing made, the plaintiff is entitled to the relief desired.

According to the law of Pennsylvania, by which the subject is necessarily governed, the so-called leases to the defendant Brown constitute a sale and conveyance of the coal and minerals in place. This is the effect of all the cases, from Caldwell v. Fulton, 31 Pa. 475, 72 Am. Dec. 760, down, and, if reiterated declaration is to count for anything, is not to be gainsaid or denied. Sanderson v. Scranton, 105 Pa. 469; D., L. & W. R. R. v. Sanderson, 109 Pa. 583, 1 Atl. 394, 58 Am. Rep. 743; Hope's Appeal (Pa.) 3 Atl. 23; Montooth v. Gamble, 123 Pa. 240, 16 Atl. 594; Fairchild v. Dunbar Furnace Co., 128 Pa. 485, 18 Atl. 443, 444; Kingsley v. Hillside Coal & Iron Co., 144 Pa. 613, 23 Atl. 250; Lazarus' Est., 145 Pa. 1, 23 Atl. 372; Timlin v. Brown, 158 Pa. 606, 28 Atl. 236; Plummer v. Hillside Iron & Coal Co., 160 Pa. 486, 28 Atl. 853; Lehigh & Wilkes-Barre Coal Co. v. Wright, 177 Pa. 387, 35 Atl. 919. "It is now well established," says Rice, P. J., in Hosack v. Crill, 18 Pa. Super. Ct. 90, affirmed 204 Pa. 97, 53 Atl. 640, "that an instrument which is in terms a demise of all the coal in, under, and upon a tract of land, with the unqualified right to mine and remove the same, is a sale of the coal in place; and this, too, whether the purchase money stipulated for is a lump sum or is a certain price for each ton mined, and is called 'rent' or 'royalty,' and also notwithstanding a term is created within which the coal is to be taken out." It is true that in Denniston v. Haddock, 200 Pa. 426, 50 Atl. 197, there is an apparent attempt to hark back to something else; it being declared to be inaccurate and unfortunate to call such a conveyance a sale, because of the tendency to mislead and the rules with respect to sales being held not to be indiscriminately applied. This is also approved in Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., 213 Pa. 28, 62 Atl. 94. But, whatever may be the modification introduced by these cases, the general doctrine remains that a grant of all the coal, with the right to remove the same, however denominated and by whatever terms conveyed, severs the coal from the surface and vests in the grantee an estate therein, with all that is incident and appurtenant thereto; and that in effect is what we have here. By indenture under his hand and seal, duly acknowledged and put on record, the grantor in each instance grants, bargains, and sells to the defendant J. Willcox Brown, his heirs and assigns, all the iron ore, coal, cement, fire clay, and other minerals of every kind, with the full and exclusive right of mining and removing the same, to and for his and their only proper use and benefit. This brings the case squarely within those which have been cited, and conveys a fee. It is true that a term is fixed within which these rights are to be exercised; but that is not material, and another is provided for, renewable forever, if it were. True, also, it is stipulated in most of the leases that a railroad shall be built within five years. But except as this introduces a condition upon which the estate is taken, and for breach of which it is made defeasible, it does not affect the character of the conveyance or the

interest which passed. It is idle to argue, from this or any other provision, that the arrangement is unilateral, the defendant merely having an option, ineffective until formally accepted by entry or other affirmative act. Not only was the grant out and out and immediate, but there was a reciprocal undertaking by the defendant to account and pay every three months at a certain royalty, for the coal and minerals mined, which notwithstanding there was no minimum, imposed a direct and positive obligation; a covenant to mine with reasonable diligence being implied. Equally useless is it, also, to contend that the provision with regard to the building of a railroad was a condition precedent, according to which, until complied with, no interest was acquired. The importance of a railroad may be conceded, no development of the region being possible without it, and the parties who stipulated for it were therefore wise. But whatever the necessity for it, or the promise with regard to its construction, there is nothing in either, out of which to make a condition precedent, holding up the grant until performed. The provision is, not that the leases shall be ineffective until the railroad is built, but that they shall be null and void unless built within a certain time. This recognizes that the estate conveyed is to vest meanwhile, making it subject to be divested later, in case of a failure to comply, creating a condition subsequent, upon which the estate is taken and held, Rannels v. Rowe (C. C. A.) 145 Fed. 296.

As a condition subsequent, however, the promise to build a railroad has to be reckoned with, and the question is as to the effect which is so to be given it. Four of the leases are untrammeled by anything of the kind—the George Fosler, Samuel Wible, Gottlieb Bantlin, and Harrison Lohr—the alleged verbal promise to these parties being unsustained; and as to them the subject may be dismissed. Those which remain differ somewhat with respect to the terms of the condition and the steps subsequently taken to enforce it, requiring a separate examination as to each; but to a certain extent they fall into classes by which the matter is simplified. In four of the leases—the David J. Shaffer, David Seese, Israel Seese, and Samuel Knavel—it is stipulated, with some immaterial variations, that if the railroad is not built or commenced along Paint creek within five years they are to be null and void. This is distinct and specific, and beyond question has not been performed. No claim is able to be made, as is done with regard to some, that the building of the Baltimore & Ohio branch along Stony creek in 1880, within the five years, was a fulfillment. All of the leases named are located in the neighborhood of Windber, four or five miles up from where Paint creek empties into Stony, at which distance a railroad along the latter is of no immediate, although there may be a remote, advantage. At all events it does not meet the terms of the condition, which the lessors had the right to insist on, and is not, therefore, a compliance with it. But a condition subsequent, such as this, is reserved for the benefit of the grantor and his privies in blood, who alone can take advantage of the breach, unless it is otherwise stipulated. McKissick v. Pickle, 16 Pa. 140. It is not available—by all the authorities—to any and every one who may happen along afterwards in the title. Atlantic & Pacific Railroad v. Mingus, 165 U. S. 413, 17 Sup.

Ct. 348,.41 L. Ed. 770; Wills v. Mfrs.' Nat. Gas Co., 130 Pa. 222, 18 Atl. 721, 5 L. R. A. 603. The estate continues undisturbed until the proper steps are taken to enforce the forfeiture, the right to do which subsists as a mere right of action, which cannot be conveyed to or vested in a stranger. Ruch v. Rock Island, 97 U. S. 693, 24 L. Ed. 1101. Nor are the present conveyances leases, within the meaning of Act 32 Hen. VIII, c. 34, by which the right might otherwise be claimed. Rob. Dig. Brit. Stat. 227. Unless, therefore, a move was made by those who were entitled to assert the breach, it is not open to the plaintiff company, which has taken title subsequently. The usual means is by entry for condition broken, but it may be by any equally significant act; a freehold estate at common law being able to be determined only by act in pais of equal notoriety with that by which it was created. Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447. It remains to be seen, what, then, if anything, was done in that direction by either of these lessors.

On December 17, 1892, Israel Seese and wife, by deed of general warranty, sold and conveyed to Robert H. Sayre, his heirs and assigns, all the coal underlying the land which they had leased in December, 1878, to the defendant Brown; Mr. Sayre subsequently conveying to the Wilmore Coal Company, by whom entry was made and the coal mined. The out and out conveyance of the coal in this way by the lessor was a direct and unequivocal assertion of title to and dominion over it, which being followed by the recording of the deed, the equivalence of livery (Caldwell v. Fulton, 31 Pa. 475, 72 Am. Dec. 760), as well as the entry on and mining of the coal under it, must be regarded, not only as expressive of an intent to take advantage of the lessee's default, but as effective to do so, the same as by entry and forfeiture actually declared. The two grants being inconsistent and conflicting, the defeasible one, under the assault so made upon it, must give way; the outstanding estate being thereby divested, and revested in the original grantor, for the benefit of his grantee. Emery v. De Colier, 117 Pa. 153, 12 Atl. 152; Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732; Wolf v. Guffey, 161 Pa. 276, 28 Atl. 1117; Bartley v. Phillips, 179 Pa. 175, 36 Atl. 217; Stone v. Marshall Oil Co., 188 Pa. 602, 41 Atl. 748, 1119; Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696; Wheeling v. Phillips, 10 Pa. Super. Ct. 634. The case of Rannels v. Rowe (C. C. A.) 145 Fed. 296, where this is denied, is to be distinguished; the second deed, although recorded, not having been brought home to the original grantee by act or entry under it. This lease, so far as the coal is concerned, is therefore dead.

The same facts appear and the same result is reached as to the David Seese lease, where there was a deed of the coal to Sayre December 28, 1892, and by him to the Wilmore Coal Company afterwards. It is true, that on May 3, 1893, the lessor assigned to the same all his right, title, and interest in and to the lease with Brown, except as to other minerals than coal, together with the rents and royalties due and to come due thereon, by which, as it is claimed, the existence of the lease was recognized and the forfeiture waived. But this was long after the deed to Mr. Sayre, and having asserted the forfeiture of the lease in that way and undertaken to convey the title, as so revested in him, he

could not do anything subsequently to call this in question. Nor is this affected by the fact that the assignment of the lease was to the same party.

The case is somewhat different with the Samuel Knavel and the David J. Shaffer leases, but not materially so. In each of these there was a deed of the coal by the lessor to Mr. Sayre—January 19, 1893, in the one instance, and December 29th, of the same year in the other—with a conveyance over to the plaintiff company later, as in the others; and on the same date there were assignments of the leases and royalties to Sayre and to the coal company, respectively. But the deeds and the assignments, although contemporaneous, were separate and independent, and the conveyance of the coal was not made subject to the leases, but was absolute and with general warranty. Whatever, therefore, might be the case, if this were otherwise, and whatever the purpose to be subserved by the assignments taken, which was probably merely precautionary, they cannot be held to qualify the effect of the deeds as an act of intended divestiture, followed, as it was, by mining under them. Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696.

In this connection the Jesse Slick and the John Koontz leases may as well be considered. In the former it was agreed that, if the lessee did not commence mining on the farm within five years, the lease was to be null and void; and in the other, "if the railroad be not commenced along Stony creek to Hagerstown within five years," the same consequence should follow. Admittedly neither of these conditions was complied with, but as to one only was advantage taken of this by the lessor. On August 13, 1900, John Koontz and wife, by deed duly recorded, sold and conveyed to John Itell, trustee, all the coal in the "B" or Miller seam—Itell in turn, May 9, 1902, conveying to Mr. Berwind, under whom the plaintiff company has entered and mined; and this, according to the conclusion reached above, avoided the lease to that extent. On the other hand, no action, so far as appears, was taken by Jesse Slick in his lifetime, nor by his heirs after his death. There was a deed by his executors, January 27, 1900, conveying the coal to D. B. Zimmerman, who, May 1, 1902, conveyed the same to Mr. Berwind. But the executors possessed no authority to avoid, and their act must be regarded as of no effect to that end, leaving the lease, so far as this is concerned, in force.

As to the John D. Shaffer lease, also, the lessee failed to comply. The provision there was that the lease should be void if the railroad was not commenced along Stony creek within five years, which would be fulfilled in terms by the building of the Baltimore & Ohio branch in 1880, if it stood alone. But it was additionally provided that "the railroad must come within one and one-half miles of the said farm," and this is as much a part of the condition as anything; and as the property was located some four miles up Paint creek, and the Baltimore & Ohio along Stony creek came no nearer than that, the condition clearly was not met. This is, however, of no advantage to the plaintiff; for, according to the test applied above, nothing was done to enforce the breach. It is true that there was a deed to Mr. Berwind from John

D. Shaffer, November 9, 1896, for all the coal in the "B" or Miller vein, one of the two veins leased to the defendant Brown. But this conveyance was made expressly subject to the terms and conditions of the lease; the grantee being given the reciprocal benefits and advantages derived therefrom. This was a recognition of the lease, and not an avoidance of it. Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696. And while it was, indeed, further provided that if the lease was void, or at any time thereafter should be held invalid, the coal as so conveyed should be free from its operation, the grantee in this respect, so far as possible, being put in the grantor's place, yet this falls far short of the assertive action required to declare the condition broken and annul the lease, which, while voidable, therefore, at that time, must now be held to be intact.

In five of the leases which remain—the Abraham Weaver, Josiah Custer, John Reel, and two Elizabeth Shaffers—the condition under discussion assumes a somewhat indefinite form: "If the railroad be not commenced within five years from this date, then the contract to be null and void." And in the other three—the Phillip E. Seese, Peter Gindelsperger, and Maria Young: "If the railroad be not commenced along Stony creek within five years," etc. There is the further provision in the Phillip E. Seese, that "as soon as the railroad is completed the second party is to commence opening said minerals"; but this, as is correctly argued, was merely a covenant or promise, and not a condition, the breach of which would entitle the lessor to avoid. With regard to all of these it is claimed that the condition was fulfilled by the construction of the Baltimore & Ohio branch along Stony creek in 1880, and so far as the last three are concerned this would seem to be the case. It is contended, however, that this was not the road contemplated, which was to run quite differently, veering off from Stony creek, up Paint or Shade, to Rockingham furnace, with Hagerstown as an objective point to the east; and that, while Brown may have put his rights of way at the service of the Baltimore & Ohio engineers, it does not appear that they were made use of, so as in any way to connect the two; also that the Phillip Seese and the Peter Gindelsperger leases were up Paint creek, in the neighborhood of Windber, and so not accessible from the road, which was of no benefit to them, except as a long spur was built into them therefrom. But the Baltimore & Ohio branch tapped the general territory, and it ran along Stony creek, which was all that was stipulated for, by the mouth of Shade and Paint, the full distance that the parties had in mind; and it thus fulfilled the letter, if not, indeed, the spirit, of the condition. Nor was it required, in order to do so, that it should be a railroad either promoted or built by Brown; all that was called for being a public means of transportation of this character, by which the coal mined could with reasonable facility be shipped to market. It is true that "the" railroad is spoken of, which might under proper circumstances be held to mean the one which was talked of at the time; but if this was intended to be insisted upon, or one which came into more immediate touch with the properties, it should have been so specified, as was done by some of the others, and the matter not be left in its present indefinite shape. Conditions subse-

quent are not favored, and it cannot be expected that an unexpressed term will be imported into them on which to claim a breach. With regard to the Maria Young, also, this lease, as I understand it, is located on Stony creek along the line of the railroad as built, of which it thus has the fullest possible advantage, and by which, therefore, upon every consideration, the condition is to be regarded as fulfilled. This lease, in addition, appears to have been released by Brown to Itell August 12, 1896, of which the plaintiff company by mesne conveyance got the eventual benefit, and no further notice will therefore be taken of it. It was evidently included in the bill by mistake.

The substance of what has been so said applies with equal force to the Abraham Weaver, Josiah Custer, John Reel, and the two Elizabeth Shaffers, where the condition was simply that "the" railroad should be built, etc., without specifying what or where. One of these, the John Reel, so far as I can gather, is on Stony creek, directly along the line of the Baltimore & Ohio, the same as the Maria Young; and, while the others are up Paint creek some distance, they had a railroad in the one which was built which was reasonably accessible, and, if it was not the one which they intended to stipulate for, it is their own fault in not doing so with more definiteness.

It is not material, in view of the conclusion so reached, to follow any of the last-named leases further, to see whether advantage was taken of the condition, assuming, notwithstanding what has been so said, that it was after all broken. In the mixed state of the record, indeed, it might be somewhat difficult to do so. It may be noted, however, that on May 23, 1895, Josiah Custer and wife conveyed the coal and minerals to Mr. Berwind but it was expressly made subject to the Brown lease in substantially the same terms as in the conveyance from John D. Shaffer noted above, with the additional and further weakening provision that Mr. Berwind should indemnify and save the grantors harmless. On September 7, 1893, Peter Gindelsperger also conveyed to Robert Sayre the coal leased to Brown, Sayre subsequently conveying to the plaintiff company by whom it has been mined out, which, notwithstanding the contemporaneous assignment of the lease, would be effective to avoid it, according to what is held above, if there was anything upon which this could in fact be predicated. There are also similar conveyances and assignments by Abraham Weaver and wife and Elizabeth Shaffer which might possibly have that effect; but, as already stated, the memoranda to be found in the record are not sufficiently clear to enable this to be decided with any certainty, and they must therefore stand. And the same is to be said with regard to the Phillip Seese and the John Reel, both of which are complicated by the division of the tracts, by which the condition, being entire and incapable of apportionment, is thus destroyed. Brewster v. Lanyon Zinc Co. (C. C. A.) 140 Fed. 801.

To summarize the results upon this part of the case: Out of the 19 leases in suit, 15 of which have been called into question by reason of the condition with regard to the building of the railroad, the Israel Seese, David Seese, Samuel Knavel, David J. Shaffer, and John Koontz —5 in all—must be held to be no longer in force; the condition in each

instance having been broken, and proper action taken to assert the breach. But as to the rest, some 10 in number, counting the Maria Young for the moment, there is nothing of the kind upon which this can be affirmed; and if they are to be avoided, therefore, it must be upon some other ground.

There remains to be considered, however, the questions of forfeiture and abandonment which have been raised, and which apply to all the leases alike, affording additional ground, if sustained, for declaring invalid those which have been already so held. The claim of forfeiture is based on the failure of the lessee to mine or pay royalty; this being in absolute and flagrant disregard, as it is said, of the purpose of leasing, which was to secure to the lessors an income from the royalties to be received. Although no minimum quantity was fixed, a covenant to mine with reasonable diligence is unquestionably to be implied. Watson v. O'Hern, 6 Watts (Pa.) 362; Lyon v. Miller, 24 Pa. 392; Ellis v. Lane, 85 Pa. 265; Koch & Balliett's App., 93 Pa. 434; Pittsburg Railroad Company's App., 99 Pa. 177; Ray v. Gas Co., 138 Pa. 576, 20 Atl. 1065, 12 L. R. A. 290, 21 Am. St. Rep. 922; Patterson v. Graham, 164 Pa. 234, 30 Atl. 247; Aye v. Phila. Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696; Price v. Nicholas, 4 Hughes, 616, Fed. Cas. No. 11,415; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320; Sharp v. Behr (C. C.) 136 Fed. 795; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 Fed. 801; Rorer Iron Co. v. Trout, 83 Va. 397, 2 S. E. 713, 5 Am. St. Rep. 285; Sharp v. Wright, 28 Beav. 120. But the remedy for a breach is not a bill to forfeit or avoid, but an action at law for damages (Koch & Balliett's App., 93 Pa. 434; Janes v. Emery Oil Co., 1 Penny. [Pa.] 242), or, possibly, an ejectment, based on a right of entry, for nonperformance (Barker v. Dale, 17 Pittsb. Leg. Journ. 19, Fed. Cas. No. 988; contra, Blair v. Peck, 1 Penny. [Pa.] 247). The lessee, as we have seen, has an estate in the coal, which cannot be defeated or divested merely by reason of covenants broken: it not being so provided in the lease. "The common-law rule is well settled that a breach by the lessee of his covenants or agreements in the lease does not work a forfeiture of the term, in the absence of an express stipulation in the lease, or the reservation of the power of re-entry in case of such breach. The general remedy of the lessor in such case is merely by action for the recovery of damages." 18 Am. & Eng. Encycl. Law (2d Ed.) 369. And this applies to implied covenants, the same as to express ones. Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N. E. 502. It may be that an action at law is not at all times adequate, and that a chancellor under some circumstances would be authorized to interfere in consequence. Brewster v. Lanyon Zinc Co. (C. C. A.) 140 Fed. 801. But that is not the case here. It may not, indeed, be altogether easy to say, without any minimum quantity reserved, for just just how much at any given time either of the lessors in the case in hand would be entitled to sue; but that cannot be regarded as insuperable, other mining operations similarly situated and conditioned affording a comparative guide. The lessee was to account and pay every three months for what he had mined; and each lessor would therefore have the right, as the measure of his damages, to sue at the

end of every such period for whatever amount could have been produced with the exercise of reasonable diligence from the tract involved, having regard to its size and the situation of the coal upon it, as well as the methods of mining in vogue at the time in that general section of the bituminous coal field (Bradford Oil Co. v. Blair, 113 Pa. 83, 4 Atl. 218, 57 Am. Rep. 442) ; and that (to meet an objection of defendants' counsel, and notwithstanding what is said in Price v. Nicholas, 4 Hughes, 616, Fed. Cas. No. 11,415, which gives some countenance to it), without reference to whether there were railroad or other facilities for transporting or handling it, as to which the lessee took the chance, having made no stipulation with regard to it, other than what we have seen. While, then, it was of the essence of the contract that mining should be prosecuted with reasonable diligence, and it would no doubt be convenient, as well as conducive to justice, if the right to forfeit for the indefinite and long-continued failure to mine or pay royalties could be imported into it—a sort of forfeiture by abandonment, as it is denominated in Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696—no case, by actual decision,[3] seems to have gone that far, and nothing, therefore, can be made out of the fact here.

Quite different, however, is the matter of abandonment. Ordinarily this is a question of fact, to be determined by the circumstances; the intent being largely controlling. But under certain conditions it may become a question of law, to be declared by the court, particularly when the facts are undisputed. Atchison v. McCulloch, 5 Watts (Pa.) 13; Forster v. McDivit, 5 Watts & S. 359. Sample v. Robb, 16 Pa. 305; Paine v. Griffiths, 86 Fed. 452, 30 C. C. A. 182. Legally defined, it may be said to be the giving up or relinquishment of property to which a person is entitled, with no purpose of again claiming it and without concern as to who may subsequently take possession. 1 Cyc. 4; Moon v. Rollins, 36 Cal. 333, 95 Am. Dec. 181; Judson v. Malloy, 40 Cal. 299; Hagan v. Gaskill, 42 N. J. Eq. 215, 6 Atl. 879; Dikes v. Miller, 24 Tex. 424; Burke v. Hammond, 76 Pa. 172. It is the voluntary forsaking or throwing away of property, leaving it open to be appropriated by the first comer. McGoon v. Ankeny, 11 Ill. 558; Eads v. Brazelton, 22 Ark. 499, 79 Am. Dec. 88. It may be a question how far a vested legal title to a corporeal hereditament can ever be lost by mere abandonment or neglect (1 Cyc. 6; 2 Washb. Real Prop. [6th Ed.] § 1888; Mayor v. Riddle, 25 Pa. 259), although it is held that it may be, in Holmes v. Railroad, 8 Am. Law Reg. (O. S.) 716, and seems to be recognized as possible in Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732, although by nothing short of the statute of limitations, as it is there said. But with regard to inchoate, and particularly mining and other similar, rights and privileges, the doctrine is well established, differing only in its application with the nature and extent of the rights and estates granted, and the character of the

[3]Bordering on this, however, it is said by Porter, J., in Cole v. Taylor, 8 Pa. Super. Ct. 19, with regard to a two years' delay to operate an oil lease: "It would seem that the failure so to produce for so unreasonable a length of time ought in equity to work a forfeiture of the rights of the lessees."

mineral or other thing affected, whether fugitive, like oil and gas, or solid and stable, like coal and ore in place. 1 Cyc. 7; 20 Am. & Eng. Encycl. of Law (2d Ed.) 775 and 785. Thus, in Aye v. Phila., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696, where there was a lease of lands for 20 years, with the exclusive right of searching and operating for oil and gas, an unexplained cessation for 4 years was held to raise a presumption of abandonment. In Patterson v. Graham, 164 Pa. 234, 30 Atl. 247, also, where standing timber was sold for a definite price, with the privilege of manufacturing it into lumber on the land, under which the vendee entered and cut substantially all the saw timber available, and then ceased operating and removed his mill, an attempt to resume 11 years afterwards and cut the timber which had matured meanwhile was held to be a trespass; the rights of the vendee having been lost by abandonment. So in Paine v. Griffiths, 86 Fed. 462, 30 C. C. A. 182, a case peculiarly like the one in hand, both in the terms of the grant, the minerals affected, and the neglect to mine, it was held by the Court of Appeals of this circuit, that where coal and other minerals, including oil and salines, had been conveyed upon a certain royalty the failure to operate or do anything under the grant for upwards of 20 years amounted to an abandonment as a matter of law, which justified a bill to declare it void as a cloud upon the title. It was further held that mere speculative attempts by the grantee to dispose of his rights were entitled to no consideration as evidence of a contrary intent; nothing further having been done and there being an utter disregard of the obligation to mine, upon which the grant rested. It is true that the right to abandon was expressly given, of which the neglect of the grantee might be regarded as evidence of a purpose to avail himself. But no point was made of that; abandonment being squarely based upon the facts which have been alluded to. See, also, Worrall v. Wilson, 101 Iowa, 475, 70 N. W. 619, for another case of a coal lease which was held to have been abandoned.

In the present instance, at the time the bill was filed, from 24 to 26 years had elapsed since the leases were executed, during which time not a thing has been done by the defendant Brown towards the mining or development of any of the properties covered by them. He has simply stood by and held on, endeavoring at times to interest others who would do something, and in a few instances selling and disposing of his rights for a consideration. According to his own admission, he never intended to do more. In the meantime, by the independent enterprise and efforts of other parties, the territory which was before discredited has been tested and shown to be valuable, and a railroad built into it. The original lessors, evidently despairing of any results from his direction, and in some instances with a declared object of getting rid of the incubus of these leases have sold out to others by whom these developments have been effected and the mining of coal extensively produced. Under the circumstances, the rights granted to the defendant by the leases in controversy must be regarded as relinquished and abandoned. No doubt, he took an estate in the minerals conveyed, but the grant was for a definite purpose; the consideration to the original owners being, not the paltry $5 or $10 recited in the deeds, whether paid

or unpaid, but the royalties which were to be derived as the result of mining. The lessee was to make the minerals of value to them, which was the whole inducement for parting with them, and that, with due diligence, an obligation which has been disregarded for nearly a gener-ation. The lessee's idea is that he can lie by indefinitely and yet retain the rights granted, having 99 years, as it is said, in which to mine, with the privilege of 99 more, and after that forever. Time is of no consequence, according to the argument, and haste not contemplated; developments being virtually left to his discretion, subject only to liability in damages for unreasonable inaction. But this is not the con-struction to be adopted. Judged by its purpose, the grant was not ab-solute and unconditional, but qualified, and the neglect to exercise the rights and privileges conveyed; for the period which appears here, to the grave detriment of the grantors, is to be taken as a relinquishment and abandonment of them, and that without regard to the acts or intent of the grantee, short of actual assertive operation. Title to land is lost by 21 years' adverse possession, by virtue of the statute, and abandon-ment may well be presumed by analogy, with regard to mining rights and privileges, conditioned on the payment of royalties, where there has been an absolute neglect to mine or pay, for a like period. No doubt the lessee here has had no idea of abandoning if he could help it, any more than of personally operating. He may also have made efforts to sell to or interest others, although nothing in this direction seems to have been done for a number of years. Within his legal rights, his purpose is immaterial; but speculative attempts of this kind amount to nothing on the question of abandonment. Paine v. Griffiths, 86 Fed. 452. 30 C. C. A. 182. It may be further true that, while in the market in this way from the start, there have been no takers, because of the coal in that section being underestimated, and for lack of full railroad facilities, until Mr. Berwind took hold of it. Taxes have also been paid, the few years they were assessed; and, when it was found that the coal was being mined, parties were sent to examine and report; and, finally, action was brought on account of it. But all this was ex parte and unrelated, and of no consequence. The fact remains that not a thing was done nor a right exercised under the leases for upwards of 24 years, and looking at it from the standpoint of the lessors, who have waited in all conscience as long as could be expected, they are therefore to be regarded as thrown up and abandoned.

It is said, however, that in Plummer v. Hillside Coal Co., 160 Pa. 483, 28 Atl. 853—followed by the Court of Appeals of this circuit in a subsequent action between the same parties, 104 Fed. 208, 43 C. C. A. 490—even the lapse of 60 years was held not to amount to this. But the distinction between that case and this is manifest. There there was a sale and conveyance of the coal outright for the price of $200, which in that early day and place was evidently accepted as its full value; an extra $100 being provided for in case the coal proved to be abundant and of a certain thickness. Beyond this there was no obliga-tion on the part of the lessee, except the nominal rent of $1 a year, in-serted probably to carry out the idea of a lease which was the form of conveyance adopted. The consideration to the lessor was not thus

147 F.—60

the development of the mineral value of the land as here. The lessee bought the coal as it stood in place at a definite price in cash; the only restriction being that he should get it out within the term of the lease, 100 years. This, as the court is careful to point out, is the controlling distinction, and the case affords no guide, therefore, where it does not appear. Nor, in adopting and following it, can the Court of Appeals be regarded as recalling or qualifying the law laid down in Paine v. Griffiths, 86 Fed. 452, 30 C. C. A. 182, where abandonment was found, under circumstances and with respect to leases, closely similar to those in hand.

It is finally said, however, that the questions litigated are legal, to be disposed of in a court of law, and that a court of equity cannot constitutionally take cognizance of them. North Penn Coal Co. v. Snowden, 42 Pa. 488, 82 Am. Dec. 530; North Shore R. R. v. Pennsylvania Co., 193 Pa. 641, 44 Atl. 1083. Actions, moreover, as is pointed out, have already been brought in the United States Circuit Court in New York, where they can appropriately be considered and passed upon, which it is the purpose of the present bill, as it is said, to forestall. Meck's App., 97 Pa. 313. But the removal of a cloud by bill, in the nature of a bill quia timet, is a well-established ground of equitable jurisdiction, and may be resorted to under proper circumstances even where the legal title is involved, and although it may not have been previously established by action at law. 17 Encycl. Plead. & Pract. 278. It is not to be exercised where there is an adequate legal remedy, but that is not the case where the moving party is in possession, and so is not in a position to assert or protect his title by action. Martin v. Graves, 5 Allen (Mass.) 661; Stewart's App., 78 Pa. 88; Dull's App., 113 Pa. 510, 6 Atl. 540; Slegel v. Lauer, 148 Pa. 236, 23 Atl. 996, 15 L. R. A. 547; Sharon v. Tucker, 144 U. S. 533, 12 Sup. Ct. 720, 36 L. Ed. 532. Neither is a pending action a bar, where it is between other parties, and extends to only a portion of the controversy, which is the situation here. Eaton v. Trowbridge, 38 Mich. 454; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 Fed. 801. The actions in New York are against the Berwind-White Coal Mining Company, and not against the plaintiff, and, whatever the relation between the two, they are nevertheless distinct and independent parties, with separate, however intimate, interests. But, more than this, the actions referred to concern only a few of the leases, as to each of which the facts are more or less different, and differ, also, with respect to those which remain. Under similar circumstances it was accordingly held, in Eaton v. Trowbridge, 38 Mich. 454, not only that a bill to remove a cloud could be entertained as to the lands not so directly drawn in controversy, but that it might be extended to embrace those actually involved in the actions pending, so as to put an end once for all to the whole litigation.

In the present instance, the material facts are not disputed, and the rights growing out of them are clear; and, having to be determined in any event by the court, it is of no consequence whether they are determined by a court of equity or a court of law. Ferguson's App., 117 Pa. 426, 11 Atl. 885; Sharon v. Tucker, 144 U. S. 533, 12 Sup. Ct. 720, 36 L. Ed. 532. For the reasons given, the leases held by the defend-

ants are clearly invalid; and, outstanding and actively asserted as they are, and that not by one action but by several, which are capable of being indefinitely and vexatiously multiplied according to the number of leases and the mining operations under each of them from time to time, they constitute a serious cloud upon the title, not only as against the present owners, but any others, who might otherwise be inclined to purchase from them. From this, according to all the authorities, there being no other adequate remedy open, the plaintiff company is entitled to be relieved. Sharon v. Tucker, 114 U. S. 533, 12 Sup. Ct. 720, 36 L. Ed. 532. And to make the decree effective the invalid instruments by which the cloud is created will be required to be delivered up and canceled, and a minute of it made in the office where they are on record. Neill v. Hitchman, 201 Pa. 207, 50 Atl. 987. Limited always, however, to the coal, and not the other minerals, as to which alone an issue has been made.

Let a decree be drawn in favor of the plaintiff to this effect, with costs.